[No. H026651. Sixth Dist. Mar. 3, 2006.]

COUNTY OF SANTA CLARA et al., Plaintiffs and Appellants, v.
ATLANTIC RICHFIELD COMPANY et al., Defendants and Respondents.

## Counsel

Cotchett, Pitre, Simon & McCarthy, Bruce L. Simon, Roberta G. Retana, Elizabeth C. Pritzker; Ann Miller Ravel, County Counsel, and Kathryn J. Zoglin for Plaintiff and Appellant County of Santa Clara.

Roy Combs for Plaintiff and Appellant Oakland Unified School District.

Dennis Jose Herrera, City Attorney, Owen Clements and Ingrid M. Evans, Deputy City Attorneys, for Plaintiff and Appellant City and County of San Francisco.

John Anthony Russo, City Attorney, Randolph W. Hall, Chief Assistant City Attorney, Andrea Ford Roberts and Christoper Kee, Deputy City Attorneys, for Plaintiff and Appellant City of Oakland.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiffs and Appellants.

Sunnie Lee Daniels for Office of the Los Angeles City Attorney as Amicus Curiae on behalf of Plaintiffs and Appellants

Jenny Chi-Chin Huang for Public Advocates, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Arnold & Porter, Sean O'Leary Morris, James Frederic Speyer, William H. Voth and Philip H. Curtis for Defendant and Respondent Atlantic Richfield Company.

McManis, Faulkner & Morgan, James McManis and William Faulkner for Defendant and Respondent NL Industries, Inc.

Heller, Ehrman, White & McAuliffe, Anna S. McLean; Orrick, Herrington & Sutcliffe, Elyse Echtman and Richard W. Mark for Defendant and Respondent American Cyanamid Company.

Greve, Clifford, Wengel & Paras and Lawrence A. Wengel for Defendant and Respondent ConAgra Grocery Products.

Glynn & Finley, Clement L. Glynn; McGuireWoods, Steven R. Williams, Collin J. Hite and William H. King, Jr., for Defendant and Respondent E.I. DuPont De Nemours & Company.

Halleland, Lewis, Nilan, Sipkins & Johnson, Michael T. Nilan, David T. Schultz; Ropers, Majeski, Kohn & Bentley and James C. Hyde for Defendant and Respondent Millennium Inorganic Chemicals Inc.

Jones, Day, Reavis & Pogue, John W. Edwards II and Elwood Lui for Defendant and Respondent Sherwin-Williams Company.

Crowley, Barrett & Karaba, Paul F. Markoff, Thomas Karaba; Robinson & Wood and Archie S. Robinson for Defendant and Respondent The O'Brien Corporation.

## OPINION

**MIHARA, J.**—A group of governmental entities acting for themselves, as class representatives, and on behalf of the People of the State of California, filed a class action against a group of lead manufacturers. The governmental entities alleged that the manufacturers were liable on theories of strict product liability, negligence and fraud for damages caused by lead paint, should be required to abate the public nuisance created by lead paint, and should be enjoined and ordered to pay restitution, disgorge profits and pay civil penalties due to their unfair business practices regarding lead paint. The superior court sustained the manufacturers' demurrers to the public nuisance causes of action. The governmental entities sought leave to file an amended complaint adding a cause of action for continuing trespass. The court denied leave on the ground that the proposed allegations did not state a cause of action. The manufacturers moved for summary judgment on statute of limitations grounds on the remaining causes of action, and the court granted the motion and dismissed the action.

On appeal, the governmental entities claim that the superior court erred in (1) sustaining the demurrers to the public nuisance causes of action, (2) denying leave to amend to add the proposed continuing-trespass cause of action, and (3) granting summary judgment on statute of limitations grounds. We conclude that the superior court's rulings were erroneous as to plaintiffs' public nuisance, strict liability, negligence, and fraud causes of action. We therefore reverse the judgment.

## I. Background

### A. Early Versions of the Complaint

Plaintiff County of Santa Clara (Santa Clara) filed a class action complaint against a number of lead manufacturers (defendants) in March 2000 alleging causes of action for strict liability, negligence, fraud and concealment, unjust enrichment, indemnity, and unfair business practices. Defendants demurred to the complaint.

Santa Clara, joined by County of Santa Cruz, County of Solano, and County of Alameda, filed an amended complaint that deleted the unfair business practices cause of action and added causes of action for civil conspiracy and nuisance. Defendants again demurred. The superior court overruled the demurrer as to the fraud and concealment cause of action. It sustained the demurrer without leave to amend as to the conspiracy cause of action and with leave to amend as to the remaining causes of action.

In January 2001, these plaintiff counties, joined by County of Kern, City and County of San Francisco, San Francisco Housing Authority, San Francisco Unified School District, City of Oakland, Oakland Housing Authority, Oakland Redevelopment Agency, and Oakland Unified School District (hereafter plaintiffs) as class representatives and on behalf of the People of the State of California (the People), filed a second amended complaint. This complaint continued to allege fraud and concealment, strict liability, and negligence. The other causes of action were replaced by causes of action for negligent breach of special duty, public nuisance, private nuisance, unfair business practices, and false advertising. Two separate public nuisance causes of action were alleged in the second amended complaint. One was brought on behalf of the People and sought abatement. The other public nuisance cause of action was brought by the class plaintiffs, rather than on behalf of the People. It alleged that the class members (local government entities) had suffered a "special injury" due to the "continuing public nuisance" created by defendants. The unfair business practices cause of action was brought solely by City and County of San Francisco (SF) on behalf of the People, and the false advertising cause of action was brought by the class plaintiffs.[1]

---

[1] The false advertising cause of action alleged that defendants' "use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of Lead, and other practices . . . constitutes unfair, deceptive, untrue, or misleading advertising" for which they sought restitution, disgorgement, and civil penalties.

Defendants demurred to the public and private nuisance, negligent breach of special duty, and false advertising causes of action. The court overruled the demurrer as to the cause of action for negligent breach of special duty. It sustained the demurrer with leave to amend as to the nuisance causes of action on the ground that "these causes of action sound in products liability rather than nuisance." It partially sustained the demurrer to the false advertising cause of action with leave to amend.

## B. The Third Amended Complaint

In June 2001, plaintiffs filed a third amended complaint that continued to allege the fraud and concealment, strict liability, negligence, negligent breach of special duty,[2] and unfair business practices (UCL) causes of action[3] and replaced the three nuisance causes of action with a single cause of action for public nuisance.

The third amended complaint alleged that defendants were "engaged in the business of, or [were] the successor[s]-in-interest to entities engaged in the business of, researching, formulating, testing, manufacturing, producing, distributing, marketing, promoting, advertising for sale, and/or selling Lead." Defendants allegedly had "engaged in a pattern of deceit and misinformation" intended to minimize the dangers of lead and attribute lead poisoning to other sources rather than "acknowledging their own culpability."

Defendants had known about the dangers of lead for nearly a century but had engaged in "a concerted effort to hide the dangers of Lead" from the government and the public. For many years, defendants promoted lead paint for interior use and claimed that it was safe. Defendants tried to stop the government from regulating lead and to prevent the government from requiring warnings about lead's hazards. Defendants opposed government efforts to combat lead poisoning. Scientific studies had only recently demonstrated that even very low levels of lead exposure could cause serious damage to fetuses, children, and adults.

Plaintiffs identified their damages generally to include: (1) costs that had been incurred to educate the public about the hazards of lead and the steps to take to minimize the risk; (2) costs incurred to inspect and test property and

---

[2] We will sometimes refer to the negligence and negligent breach of special duty causes of action collectively as the negligence causes of action.

[3] The unfair competition law (UCL) bars unfair business practices. (Bus. & Prof. Code, § 17200.) We will refer to this cause of action as the UCL cause of action.

the environment for the presence of lead; (3) costs incurred to train and fund staff to investigate and respond to lead-contaminated properties and lead-exposed children; and (4) costs incurred for "Property Damage," which was identified as "abatement, removal, replacement, and/or remediation of Lead in private, county, and city owned, managed, leased, controlled, and/or maintained properties." Plaintiffs alleged that they had been required to expend money to remediate and abate lead on their properties.

## C. Demurrer to Public Nuisance Cause of Action

Defendants filed a demurrer to the public nuisance cause of action in the third amended complaint. The court viewed the issue as "novel as to whether or not public nuisance is going to be extended to this kind of conduct . . . ." Plaintiffs argued that "the products liability claim and public nuisance claims are extremely, extremely different types of claims; and there's very, very significant differences in the remedies that you're able to seek under a products liability claim versus a public nuisance claim." The court sustained the demurrer without leave to amend.

## D. Proposed Fourth Amended Complaint

In November 2002, plaintiffs sought leave to file a fourth amended complaint adding a cause of action for continuing trespass to real property and amending the UCL cause of action to include Santa Clara (in addition to SF).

The court denied plaintiffs' request for leave to file a fourth amended complaint on the ground that the amended complaint "fails to state facts sufficient to constitute a cause of action in continuing trespass." The court also denied leave to add Santa Clara to the UCL cause of action on the ground that Santa Clara lacked standing to assert such a cause of action on behalf of the People.

## E. Summary Judgment Motion and Ruling

In February 2003, defendants moved for summary judgment or summary adjudication of the fraud, strict liability, negligence, and UCL causes of action based solely on the statute of limitations. The limitations period for the fraud, negligence, and strict liability causes of action was three years (Code Civ. Proc., § 338, subds. (b), (d)), and the limitations period for the UCL cause of action was four years. (Bus. & Prof. Code, § 17208.) Defendants argued that all of the claimed injuries had occurred before 1997 and plaintiffs had

discovered or should have discovered their causes of action before 1997. Defendants claimed that any injuries had occurred "no later than, and indeed well before, 1978" because plaintiffs were asserting that their injuries occurred "when lead paint was applied to the surfaces of their properties."

Defendants' separate statement of undisputed facts was very concise. They asserted that it was undisputed that lead paint was banned for consumer use and for use in public buildings in 1978 and that any lead paint applied to plaintiffs' buildings had been put there before 1978. Defendants claimed that "[p]laintiffs assert that lead paint is hazardous even if it is in good condition, that lead paint constantly and continuously damages those exposed to it, and that the presence of lead paint in each building containing it is injurious to health." Because plaintiffs knew of "lead paint health hazards" prior to 1997, all of their causes of action were, according to defendants, barred by the statutes of limitations.

Plaintiffs asserted that defendants were not entitled to summary judgment because plaintiffs could not have identified the damage caused by lead in their buildings any earlier than 1999, when the federal and state laws defining "lead-based paint hazards" were enacted. They claimed that they could not have known "that their buildings exposed persons to Defendants' lead-based paint at levels likely to result in 'adverse human health effects' prior to January 1999, for the simple reason that there did not yet exist any legal standard for identifying these 'lead-based paint hazards.'" (Original italics omitted.) "Plaintiffs cannot rely on informal accounts of what constitutes a 'lead-based paint hazard.' Plaintiffs must instead follow governmental standards for identifying and removing such hazards from their properties."

At the hearing on the motion, plaintiffs conceded that it was "generally recognized" in 1978, and known to them at that time, that lead paint itself was a "poison" and a "hazard." They also conceded that they were seeking damages solely for testing and remediation. Plaintiffs argued that their knowledge did not cause the limitations period to commence to run. They contended that defendants had failed to demonstrate when plaintiffs' causes of action accrued, since defendants had not presented any evidence of "deterioration from lead paint in . . . any particular building." It was agreed with respect to this argument that the issue was "what constitutes damage." Plaintiffs claimed that the damage occurred when the paint deteriorated, and defendants asserted that the damage occurred when the paint was originally applied. Plaintiffs noted that "in the absence of evidence . . . [of] damage to the property[,] . . . defendants would be in a pretty strong position to say we don't have a cause of action."

Defendants argued that lead paint was hazardous from the time of its application. They claimed that it was wrong of plaintiffs to claim that they

had to show that a particular building had been damaged. Plaintiffs had earlier claimed that "property by property discovery" was irrelevant to the statute of limitations issue and asked defendants to restrict such discovery until after the resolution of the statute of limitations issue.

The court decided to grant defendants' motion. "I do this somewhat reluctantly because frankly I think there is a potential for a lot of very interesting litigation here, and I don't know where it will ultimately end up . . . ." The court found that "the evidence . . . establishes that the injury occurs at the time the paint was applied." "Whether or not it had started to deteriorate, it was a hazard that had to be dealt with." "[T]he law is not without controversy as to when the damage occurs, but I think that the better rule is that it all occurs when applied. I think that if you do otherwise, one of the damages is that you separate multiple causes of action between the same parties. That makes no sense to me that that would be the case." The court found no evidence of concealment that could have delayed the commencement of the limitations period. With regard to the UCL cause of action, the court found that plaintiffs' allegations related to things that plaintiffs had knowledge of more than four years before filing suit.

In August 2003, the superior court entered an order granting defendants' summary judgment motion and finding that all of plaintiffs' remaining causes of action were barred by the statutes of limitations. A judgment of dismissal was entered in October 2003, and plaintiffs filed a timely notice of appeal.

## II. Discussion

### A. Demurrer

Plaintiffs assert that the superior court erred in sustaining demurrers to their public nuisance causes of action. Two separate public nuisance causes of action were alleged in the *second* amended complaint: one on behalf of the People seeking abatement and one brought by the class plaintiffs alleging a special injury.[4] The superior court sustained defendants' demurrer with leave

---

[4] One alleged that it was brought on behalf of the People and asserted that lead "is present in large numbers of homes, buildings, and other property" and "is injurious to the health of the public so as to interfere with the comfortable enjoyment of life and/or property . . . ." Plaintiffs alleged that defendants' "conduct" was "an unreasonable interference with common rights enjoyed by the People of the State of California and by the general public . . . because defendants knew or should have known that conduct would create a continuing problem with long-lasting significant negative effects on the rights of the public." "Defendants' conduct created this public nuisance and defendants' actions are a direct and legal cause of the public nuisance." Plaintiffs sought abatement of the nuisance.

The other public nuisance cause of action was brought by the class plaintiffs, rather than on behalf of the People. It alleged that the class members (local governmental entities) "have

to amend as to both of these causes of action. Plaintiffs' *third* amended complaint contained an amended version of the cause of action brought on behalf of the People but omitted the cause of action by the class plaintiffs. The trial court sustained defendants' demurrer without leave to amend to the public nuisance cause of action in the third amended complaint. We will sometimes refer to the cause of action in the third amended complaint as the representative cause of action and the cause of action that was in the second amended complaint but not in the third amended complaint as the class plaintiffs' cause of action.

## 1. Standard of Review

" 'On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. . . .' [Citations.] The only issue on appeal is 'whether the complaint states facts sufficient to constitute a cause of action.' " (*A. C. Label Co. v. Transamerica Ins. Co.* (1996) 48 Cal.App.4th 1188, 1191 [56 Cal.Rptr.2d 207].)

## 2. The Representative Public Nuisance Cause of Action

The public nuisance cause of action in the third amended complaint was brought by Santa Clara, SF, and City of Oakland (Oakland) on behalf of the People.[5] It alleged that the People had "a common right to be free from the detrimental affects [*sic*] of Lead in homes, buildings, and property in the State of California." Yet "Lead is present on large numbers of homes, buildings, and other property throughout the State of California," "is injurious to the health of the public" and constitutes a nuisance. "Defendants are liable in public nuisance in that they created and/or contributed to the creation of and/or assisted in the creation and/or were a substantial contributing factor in the creation of the public nuisance" by: "[e]ngaging in a massive campaign to promote the use of Lead on the interiors and exteriors of private residences and public and private buildings and for use on furniture and toys;" failing to warn the public about the dangers of lead; selling, promoting and distributing lead; trying to discredit evidence linking lead poisoning to lead; trying to stop regulation and restrictions on lead; and trying to increase the market for lead. Plaintiffs alleged that the lead distributed by defendants "inevitably has

suffered a special injury with respect to the presence of Lead in homes, buildings, and other property owned, managed, leased, controlled, and/or maintained by" them and that defendants' conduct "had created a continuing public nuisance" that was injurious to them.

[5] Since this cause of action was brought solely by Santa Clara, SF and Oakland, it could seek abatement of properties affected only within those communities—not throughout the State of California. (Code Civ. Proc., § 731.)

deteriorated and/or is deteriorating and/or will deteriorate thereby contaminating these homes, buildings, and property" and exposing people to lead. The remedy sought was abatement "from all public and private homes and property so affected throughout the State of California."

Defendants argue that their demurrer to the representative cause of action was properly sustained. They claim that no public nuisance cause of action may be pleaded against a manufacturer of a product that creates a health hazard because such hazards are remediable solely through products liability. They also maintain that this cause of action could never succeed because plaintiffs could not obtain the only remedy they sought—abatement.

Defendants do not maintain that the facts alleged in the third amended complaint fail to satisfy any specific element of a public nuisance. Instead, they claim that, even where the facts would otherwise constitute a public nuisance, a cause of action does not lie because the underlying cause of the public nuisance is a product for which *only* a products liability cause of action will lie.

"*Anything* which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance." (Civ. Code, § 3479, italics added.) "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) "The remedies against a public nuisance are: [¶] 1. Indictment or information; [¶] 2. A civil action; or, [¶] 3. Abatement." (Civ. Code, § 3491.) "A civil action may be brought in the name of the people of the State of California to abate a public nuisance . . . ." (Code Civ. Proc., § 731; see Gov. Code, § 26528.)

■ "[P]ublic nuisances are offenses against, or interferences with, the exercise of *rights common to the public*." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103 [60 Cal.Rptr.2d 277, 929 P.2d 596], original italics.) "Of course, not every interference with collective social interests constitutes a public nuisance. To qualify, and thus be enjoinable [or abatable], the interference must be both *substantial* and *unreasonable*." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1105 [60 Cal.Rptr.2d 277, 929 P.2d 596] (*Acuna*).) It is substantial if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted. (*Acuna*, at p. 1105.)

Santa Clara, SF, and Oakland brought a civil action in the name of the People seeking to abate a public nuisance. They alleged that lead causes

grave harm, is injurious to health, and interferes with the comfortable enjoyment of life and property. Clearly their complaint was adequate to allege the existence of a public nuisance for which these entities, acting as the People, could seek abatement. The next question was whether defendants could be held responsible for this public nuisance.

■ "[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant *created or assisted in the creation of the nuisance*." (*City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28, 38 [13 Cal.Rptr.3d 865], italics added (*Modesto*); see *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1137 [281 Cal.Rptr. 827]; *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1619–1620 [271 Cal.Rptr. 596]; *Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 101 [195 Cal.Rptr. 737].)

Here, Santa Clara, SF, and Oakland alleged that defendants assisted in the creation of this nuisance by concealing the dangers of lead, mounting a campaign against regulation of lead, and promoting lead paint for interior use even though defendants had known for nearly a century that such a use of lead paint was hazardous to human beings. Defendants "[e]ngag[ed] in a massive campaign to promote the use of Lead on the interiors and exteriors of private residences and public and private buildings and for use on furniture and toys." Had defendants not done so, lead paint would not have been incorporated into the interiors of such a large number of buildings and would not have created the enormous public health hazard that now exists. Santa Clara, SF, and Oakland have adequately alleged that defendants are liable for the abatement of this public nuisance.

Yet defendants claim that they may not be held liable on a public nuisance cause of action because two Court of Appeal opinions have held that public nuisance is an inappropriate cause of action against a product manufacturer for a nuisance caused by the product. They rely on the Second District Court of Appeal's decision in *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575 [35 Cal.Rptr.2d 876] (*San Diego*) and the First District Court of Appeal's decision in *Modesto*.

*San Diego* was an action by the city against the manufacturers and distributors of asbestos-containing building materials. (*San Diego, supra,* 30 Cal.App.4th at p. 578.) The city had purchased and installed the asbestos-containing materials many years earlier. (*Id.* at p. 579.) The city asserted causes of action for nuisance, strict liability, and negligence based on allegations that its public buildings had been contaminated by asbestos

particles from these materials, and it sought to recover "money it spent and will spend to identify and abate the asbestos danger, and for loss of use and decline in value of its property." (*Id.* at p. 578.)

One of the issues on appeal in *San Diego* was whether the defendants could be held liable for creating or assisting in creating a nuisance[6] on the city's property. (*San Diego, supra,* 30 Cal.App.4th at pp. 581, 584.) The city claimed that the defendants could be held liable for a continuing nuisance created by the deterioration of the asbestos-containing building materials. (*Id.* at p. 584.) The Second District concluded that the trial court had not erred in granting judgment on the pleadings "because City has essentially pleaded a products liability action, not a nuisance action." (*Id.* at p. 585.) "City cites no California decision, however, that allows recovery for a defective product under a nuisance cause of action. Indeed, under City's theory, nuisance 'would become a monster that would devour in one gulp the entire law of tort . . . .' [Citation.]" (*San Diego, supra,* 30 Cal.App.4th at p. 586.) Noting that other jurisdictions had not permitted plaintiffs to recover damages under a nuisance theory for "defective asbestos-containing building materials," the Second District concluded that the city's cause of action was "a products liability action in the guise of a nuisance action" and affirmed the trial court's dismissal of the nuisance cause of action. (*Id.* at pp. 586–587.)

*Modesto* was an action brought by the City of Modesto's Redevelopment Agency (the City) against manufacturers and distributors of dry cleaning solvents and equipment and dry cleaning retailers. This action included causes of action for negligence per se and violation of the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq.) (the Polanco Act). (*Modesto, supra,* 119 Cal.App.4th at p. 33.) The complaint alleged that the manufacturers and distributors instructed the dry cleaners that the solvents could be discharged into sewers, or failed to warn them not to do so. (*Ibid.*) The City sought the cost of cleaning up the sewers, as authorized by the Polanco Act. (*Ibid.*) The trial court granted summary adjudication to most of the defendants on the City's causes of action for negligence per se and violation of the Polanco Act.[7] The basis for the summary adjudication was that

---

[6] Nowhere in the Second District's opinion is there any indication that the city was pursuing a *public* nuisance cause of action rather than a *private* nuisance cause of action. The opinion's analysis suggests that the cause of action may have been for a private nuisance, since damages were sought and there was no mention of a "special injury" to the city, which is necessary for a plaintiff to recover damages in a public nuisance action. (Civ. Code, § 3493; *Frost v. City Of Los Angeles* (1919) 181 Cal. 22, 24–25 [183 P. 342].)

[7] The City's action also alleged causes of action for public nuisance and private nuisance, but those causes of action were not summarily adjudicated and were not involved in the writ petition that was before the First District. (*Modesto, supra,* 119 Cal.App.4th at p. 33.)

the manufacturers and distributors had not discharged the solvents or caused or permitted the solvents to be discharged. (*Ibid.*) The City sought writ relief. (*Id.* at p. 34.)

The Polanco Act issue required the First District to construe Water Code section 13304. This statute provides that a party is liable for a waste discharge under the Polanco Act if it discharged waste, or caused or permitted a discharge of waste, that created, or threatened to create, "a condition of pollution or nuisance." (*Modesto, supra,* 119 Cal.App.4th at pp. 36–37; Wat. Code, § 13304, subd. (a).) The City argued that the defendants were liable for creating or assisting in creating the nuisance caused by the discharge of the solvents even if they had neither directly discharged the waste nor exercised authority over those who did discharge it. (*Modesto, supra,* 119 Cal.App.4th at p. 36.)

The First District initially concluded that Water Code section 13304 "appears to be harmonious with the common law of [public] nuisance" and decided that the Polanco Act therefore had to be construed in light of the common law principles of public nuisance. (*Modesto, supra,* 119 Cal.App.4th at pp. 37–38.) It then acknowledged that those who "create or assist [in the creation of]" a public nuisance could be held liable for the nuisance. (*Id.* at p. 38.) "[L]iability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance." (*Ibid.*)

The First District looked to *San Diego* for guidance. "We agree with *City of San Diego* that the law of nuisance is not intended to serve as a surrogate for ordinary products liability." (*Modesto, supra,* 119 Cal.App.4th at p. 39.) In the First District's view, "[m]anufacturing, producing or supplying defective products or failing to warn consumers of the dangers of a defective product" does not amount to assisting in creating a nuisance and "does not fall within the context of nuisance, but is better analyzed through the law of negligence or products liability, which have well-developed precedents to determine liability for failure to warn [and distribution of defective products]." (*Id.* at pp. 39, 42.)

The First District went on to hold that "manufacturing or selling solvents to dry cleaners, with knowledge of the hazards of those substances, without alerting the dry cleaners to proper methods of disposal" did not amount to creating or assisting in the creation of a nuisance. (*Modesto, supra,* 119 Cal.App.4th at p. 42.) "Here, any failure to warn was not an activity directly connected with the disposal of solvents. In our view, such behavior is analogous to the manufacture, distribution, and supplying of asbestos-containing materials in *City of San Diego*." (*Ibid.*) On the other hand,

the First District also held that "a reasonable fact finder might conclude that defendants who manufactured equipment designed to discharge waste in a manner that will create a nuisance, or who specifically instructed a user to dispose of wastes in such a manner, could be found to have caused or permitted a discharge." (*Id.* at pp. 41–42.) It directed the trial court to reconsider its summary adjudication rulings based on these standards. (*Id.* at p. 44.)

The reasoning in *San Diego* and *Modesto* does not dictate the result in the case before us. *San Diego* was a nuisance action brought by the city *on its own behalf for damages to its buildings*. The manufacturers and distributors of the asbestos-containing building materials were alleged to be liable for this nuisance because they *produced a defective product. Modesto* was a *statutory action under the Polanco Act* by the City *on its own behalf for the cost of cleaning up its sewers*. The manufacturers and distributors of the dry cleaning solvents were alleged to be liable for the discharge of the solvents because they either instructed the dry cleaners to discharge the solvents into sewers or failed to warn the dry cleaners not to do so. The First District held that those defendants who instructed dry cleaners to discharge the solvents into sewers could be held liable but those who merely failed to warn could not be held liable.

*San Diego* and *Modesto* are distinguishable from the case before us. Here, the representative cause of action is a public nuisance action brought *on behalf of the People seeking abatement*. Santa Clara, SF, and Oakland are *not* seeking *damages* for injury to *their* property or the cost of remediating *their* property. Liability is not based merely on production of a product or failure to warn. Instead, liability is premised on defendants' *promotion of lead paint for interior use* with knowledge of the hazard that such use would create. This conduct is distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product; indeed, it is quite similar to instructing the purchaser to use the product in a hazardous manner, which *Modesto* found *could* create nuisance liability.

██ A *representative* public nuisance cause of action seeking *abatement* of a hazard created by affirmative and knowing *promotion of a product for a hazardous use* is *not* "essentially" a products liability action "in the guise of a nuisance action" and does not threaten to permit public nuisance to " 'become a monster that would devour in one gulp the entire law of tort . . . .' " (*San Diego, supra,* 30 Cal.App.4th at pp. 586–587.) Because this type of nuisance action does not seek damages but rather abatement, a plaintiff may obtain relief *before* the hazard causes any physical injury or physical damage to property. A public nuisance cause of action is not premised on a defect in a product or a failure to warn but on affirmative conduct that assisted in the

creation of a hazardous condition. Here, the alleged basis for defendants' liability for the public nuisance created by lead paint is their affirmative promotion of lead paint for interior use, not their mere manufacture and distribution of lead paint or their failure to warn of its hazards.

■ In contrast, a products liability action may be brought only by one who has already suffered a physical injury to his or her person or property, and the plaintiff in a products liability action is limited to recovering damages for such physical injuries. A products liability action does not provide an avenue to prevent future harm from a hazardous condition, and it cannot allow a public entity to act on behalf of a community that has been subjected to a widespread public health hazard. For these reasons, we are convinced that the public nuisance cause of action in the third amended complaint is not a disguised version of plaintiffs' products liability causes of action and is not invalid under the theory set forth in *San Diego* and *Modesto*.

■ The mere fact that plaintiffs alleged both a public nuisance cause of action and products liability causes of action in their third amended complaint is of no moment. "That a given set of facts fortuitously supports liability on two legal theories is not a principled reason to deny a party the right to pursue each theory." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 104 [87 Cal.Rptr.2d 754].) We do not believe that the fact that defendants were manufacturers and distributors of lead means that they may not be held liable for their intentional promotion of the use of lead paint on the interiors of buildings with knowledge of the public health hazard that this use would create. The fact that the pre-1978 manufacture and distribution of lead paint was "in accordance with all existing statutes does not immunize it from subsequent abatement as a public nuisance." (*City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 101–102 [48 Cal.Rptr. 889, 410 P.2d 393].)

■ Defendants also assert that the representative cause of action was flawed because defendants lacked the ability to abate the alleged nuisance, and abatement was the only remedy that Santa Clara, SF, and Oakland could seek. "An abatement of a nuisance is accomplished by a court of equity by means of an injunction proper and suitable to the facts of each case." (*Sullivan v. Royer* (1887) 72 Cal. 248, 249 [13 P. 655]; see *People v. Selby Smelting And Lead Co.* (1912) 163 Cal. 84, 90 [124 P. 692].) "[A]lthough California's general nuisance statute expressly permits the recovery of damages in a public nuisance action brought by a specially injured party, it does not grant a damage remedy in actions brought on behalf of the People to abate a public nuisance." (*People ex rel. Van de Kamp v. American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 333, fn. 11 [188 Cal.Rptr. 740, 656 P.2d 1170].) The plaintiffs in a representative public nuisance action may not avoid this rule by

seeking damages in the form of the "costs of abatement." (*County of San Luis Obispo v. Abalone Alliance* (1986) 178 Cal.App.3d 848, 859–860 [223 Cal.Rptr. 846].)

Defendants make this contention notwithstanding the fact that this issue is before us on review of a trial court order sustaining a demurrer without leave to amend. Our role is limited to considering whether the third amended complaint " 'states facts sufficient to constitute a cause of action.' " (*A. C. Label Co. v. Transamerica Ins. Co.*, supra, 48 Cal.App.4th 1188, 1191.) The third amended complaint clearly alleges that lead *remains present* in buildings in Santa Clara, SF, and Oakland, and that removal of this lead is necessary to prevent future harm to the public. There is no indication in the third amended complaint that defendants lack the ability to comply with an abatement order requiring them to remove the lead in these buildings. While Santa Clara, SF, and Oakland may not recover damages or reimbursement for past remediation of these hazards, the pleaded representative public nuisance cause of action seeking future abatement suffers from no apparent infirmity.

Defendants claim that they lack the "ability to abate" and are "in no position to abate" because they do not "own or control" the buildings in which the lead is located. They cite no authority to support the proposition that a complaint alleging facts that otherwise state an abatement cause of action for public nuisance is demurrable on this ground. Abatement, as we have already noted, is accomplished by "an injunction proper and suitable to the facts of each case." (*Sullivan v. Royer*, supra, 72 Cal. at p. 249.) While the ability to comply with an injunction must be pleaded in a contempt proceeding (*In re Ny* (1962) 201 Cal.App.2d 728, 731 [20 Cal.Rptr. 114]), we have located no authority for the proposition that the ability to abate must be affirmatively pleaded in an abatement action. We decline to hold the pleading insufficient for failing to explicitly allege that defendants have the ability to abate the nuisance. We also note that there is no indication that Santa Clara, SF, and Oakland could not have amended the third amended complaint to allege that defendants had the ability to abate if such an allegation was necessary. The trial court erred in sustaining the demurrer to this cause of action without leave to amend.

### 3. The Class Plaintiffs' Public Nuisance Cause of Action

This brings us to plaintiffs' claim that the superior court also erred in sustaining defendant's demurrer with leave to amend to the class plaintiffs' public nuisance cause of action in the second amended complaint. Plaintiffs chose not to amend that cause of action. Defendants assert that plaintiffs are precluded from challenging the court's ruling on that cause of action because they filed a third amended complaint. We disagree.

"Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and *any intermediate ruling*, proceeding, order or decision *which involves the merits or necessarily affects the judgment* or order appealed from or which substantially affects the rights of a party" if the intermediate order was not appealable. (Code Civ. Proc., § 906, italics added.) When a demurrer is sustained with leave to amend, and the plaintiff chooses not to amend but to stand on the complaint, an appeal from the ensuing dismissal order may challenge the validity of the intermediate ruling sustaining the demurrer. (*Bank of America v. Superior Court* (1942) 20 Cal.2d 697, 703 [128 P.2d 357].) On the other hand, where the plaintiff chooses to amend, any error in the sustaining of the demurrer is ordinarily waived. (*Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311 [70 Cal.Rptr. 849, 444 P.2d 481]; *Metzenbaum v. Metzenbaum* (1948) 86 Cal.App.2d 750, 752 [195 P.2d 492].)

Here, the order sustaining the demurrer to the class plaintiffs' public nuisance cause of action in the second amended complaint with leave to amend involved the merits of the cause of action and was not directly appealable. Plaintiffs elected to stand on their second amended complaint as to that cause of action rather than attempt to amend that cause of action. The rule that a choice to amend waives any error can reasonably be applied only on a *cause-of-action-by-cause-of-action basis*. If a plaintiff chooses not to amend one cause of action but files an amended complaint containing the remaining causes of action or amended versions of the remaining causes of action, no waiver occurs and the plaintiff may challenge the intermediate ruling on the demurrer on an appeal from a subsequent judgment. It is only where the plaintiff amends the cause of action to which the demurrer was sustained that any error is waived. Here, by choosing not to amend the class plaintiffs' public nuisance cause of action, plaintiffs clearly elected to stand on the second amended complaint with respect to that cause of action and may challenge the court's ruling on that cause of action on an appeal from the subsequent dismissal of their action.

Code of Civil Procedure section 472c confirms this analysis. "The following orders shall be deemed open on appeal where an amended pleading is filed after the court's order: [¶] (1) An order sustaining a demurrer to a cause of action within a complaint or cross-complaint where the order did not sustain the demurrer as to the entire complaint or cross-complaint." (Code Civ. Proc., § 472c, subd. (b).) Here, the superior court's order sustaining the demurrer to the class plaintiffs' public nuisance cause of action in the second amended complaint did not sustain the demurrer as to all of the causes of action. Thus, the validity of that order was "open on appeal" notwithstanding the fact that an amended pleading was thereafter filed.

We therefore reach the merits of plaintiffs' contention that the trial court erred in sustaining the demurrer to the class plaintiffs' public nuisance cause of action in the second amended complaint.

■ Ordinarily, "[w]here a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons." (*Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*, supra, 221 Cal.App.3d at p. 1616 [271 Cal.Rptr. 596].) Here, plaintiffs have pursued the full panoply of tort remedies. They seek abatement and damages on a host of theories. The narrow question we must resolve is whether, in addition to a cause of action for public nuisance seeking abatement and products liability causes of action seeking damages, they may also pursue a public nuisance cause of action seeking damages.

In light of *San Diego* and *Modesto*, we are reluctant to extend liability for damages under a public nuisance theory to an arena that is otherwise fully encompassed by products liability law. The class plaintiffs' public nuisance cause of action, unlike the representative cause of action, is brought on their own behalf (rather than on behalf of the People) and seeks damages for a special injury rather than abatement, so, unlike the representative cause of action, it is difficult to distinguish the class plaintiffs' public nuisance cause of action from the causes of action that were disapproved in *San Diego* and *Modesto*. It is true that the class plaintiffs' public nuisance cause of action, like the representative cause of action, alleges that defendants did something more than merely manufacture and distribute a product and fail to warn. Nevertheless, the class plaintiffs' public nuisance cause of action is much more like a products liability cause of action because it is, at its core, an action for *damages for injuries caused to plaintiffs' property by a product*, while the core of the representative cause of action is an action for remediation of a public health hazard. While the issue is close, we are not convinced that *San Diego* and *Modesto* erred in concluding that liability for damages for product-related injuries should not be extended beyond products liability law to public nuisance law. The superior court did not err in sustaining the demurrer to the class plaintiffs' public nuisance cause of action.

## B. Denial of Leave to Amend To Add Trespass Cause of Action

Plaintiffs contend that the superior court abused its discretion in denying leave to amend the third amended complaint to add a continuing trespass cause of action.

### 1. Standard of Review

The superior court was vested with discretion to grant or deny leave to file an amended pleading adding a cause of action (Code Civ. Proc., § 473, subd. (a)(1)), and we review its decision to deny leave for abuse of discretion. "When a request to amend has been denied, an appellate court is confronted by two conflicting policies. On the one hand, the trial court's discretion should not be disturbed unless it has been clearly abused; on the other, there is a strong policy in favor of liberal allowance of amendments. This conflict 'is often resolved in favor of the privilege of amending, and reversals are common where the appellant makes a reasonable showing of prejudice from the ruling.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 296–297 [216 Cal.Rptr. 443, 702 P.2d 601].)

Here, the superior court concluded that the additional allegations in the proposed amended pleading would not have stated a cause of action for trespass. Since plaintiffs could not have been prejudiced by denial of leave if the additional allegations would not state a cause of action for trespass, we must determine whether the superior court's conclusion was correct.

### 2. The Proposed Trespass Allegations

The proposed trespass cause of action would have been a class action brought by Santa Clara, SF, and Oakland, and was limited to properties "owned, managed, leased, controlled, and/or maintained by Plaintiffs and the Class." Abatement was sought as a remedy. Plaintiffs alleged they had been harmed by defendants' campaign to market, distribute, and promote the use of lead and to stop regulation and restrictions on lead, and defendants' failure to warn the public of the dangers of lead despite their knowledge that lead was harmful. Plaintiffs sought to allege that defendants had "caused the placement of Lead on Plaintiffs' and Class members' properties, or otherwise directly or indirectly caused Lead to invade their properties and interfere with their exclusive interest in and possession of" these properties. The proposed trespass cause of action would have alleged that the lead on these properties "has deteriorated and/or is deteriorating and/or will deteriorate thereby contaminating these homes, buildings, and properties, constituting a continuing interference with the possession and/or use of these properties, and danger to the inhabitants thereof." The proposed fourth amended complaint would have alleged that the trespass was a continuing one because "[t]he impact of Lead . . . may vary over time."

### 3. Analysis

■ " '[T]respasses may be committed by consequential and indirect injuries as well as by direct and forcible injuries.' " (*Gallin v. Poulou* (1956)

140 Cal.App.2d 638, 641 [295 P.2d 958].) However, " '[t]respass is an unlawful interference with *possession* of property . . . [and] [p]eaceable entry on land by consent is not actionable.' " (*Mangini v. Aerojet-General Corp.*, *supra*, 230 Cal.App.3d 1125, 1141 [281 Cal.Rptr. 827], italics added.)

The flaw in the proposed trespass cause of action is that plaintiffs' pleadings indisputably establish that the lead was placed on plaintiffs' property *by plaintiffs* or with their consent. Their alleged lack of knowledge at that time of lead's dangerous propensities does not vitiate their consent to the placement of the lead on their properties, though it may make that consent uninformed. The most analogous case to this one is one involving asbestos and trespass.

"Fibreboard placed defective products into the stream of commerce without alerting the public as to their hazardous nature. Plaintiffs, not knowing the products were hazardous, purchased them and incorporated them into their buildings. The purchase of the products with the resulting transfer of ownership and control to plaintiffs halts the directive flow of the product by defendants and takes these cases out of the trespass paradigm. It is the plaintiffs' property, voluntarily incorporated into the buildings with plaintiffs' permission, that is causing the harm and, thus, there is no third party interference sufficient to sustain trespass liability. Fibreboard may be liable for many wrongs, but they did not commit a trespass by selling a bad product. That the product ends up on a person's land and is intended to be used on the land does not change the picture. All products end up in a physical location that is owned by someone. If they are defective and cause harm, the manufacturer will be liable under a variety of products liability theories but not for a wrongful entry or invasion upon the land." (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 512 [20 Cal.Rptr.2d 376] (*Fibreboard*).)

■ It is true that *Fibreboard* arose in the context of an insurance coverage dispute between the manufacturer and the insurer, but its reasoning is equally applicable to the proposed trespass cause of action alleged here. Where the owner of property voluntarily places a product on the property and the product turns out to be hazardous, the owner cannot prosecute a trespass cause of action against the manufacturer of that product because the owner has consented to the entry of the product onto the land. The superior court did not abuse its discretion in denying leave to file an amended pleading adding the proposed trespass cause of action because the proposed allegations did not state a trespass cause of action.

## C. Summary Judgment on Statute of Limitations Grounds

Defendants moved for summary judgment on plaintiffs' strict liability, negligence, fraud, and UCL causes of action on statute of limitations grounds, and the superior court granted their motion. Plaintiffs claim that the superior court erred in doing so because none of these causes of action were barred by the statutes of limitations.

### 1. Standard of Review

"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo." (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].) "While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923].)

When the defendant moves for summary judgment on statute of limitations grounds, the defendant bears both the initial burden of production and the burden of persuasion that the limitations period has expired. (Code Civ. Proc., § 437c, subd. (p)(2).) The "initial burden of production [requires the defendant] to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) The burden of persuasion requires the defendant to show that there are no triable issues of material fact and that the defendant is entitled to judgment as a matter of law. (*Id.* at p. 850.)

### 2. Accrual and the Commencement of the Limitations Period

" 'Generally, a cause of action accrues and the statute of limitation begins to run when a suit may be maintained. . . . "Ordinarily this is when the wrongful act is done and the obligation or the liability arises, but it does not 'accrue until the party owning it is entitled to begin and prosecute an action thereon.' " . . . In other words, "[a] cause of action accrues 'upon the occurrence of the last *element essential to the cause of action.*' " ' " (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809,

815 [107 Cal.Rptr.2d 369, 23 P.3d 601], citations omitted, italics added.) A tort cause of action accrues only when "appreciable and actual harm" is caused by the wrongful conduct. (*Budd v. Nixen* (1971) 6 Cal.3d 195, 201 [98 Cal.Rptr. 849, 491 P.2d 433].) "If the [wrongful] conduct does not cause damage, it generates no cause of action in tort." (*Budd*, at p. 200.)

██ But the limitations period does not begin to run until the plaintiff discovers or should have discovered the cause of action. "The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. . . . A plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." (*Jolly v. Eli Lilly & Co., supra,* 44 Cal.3d 1103, 1109, citation and fn. omitted.) "Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (*Id.* at p. 1111.)

██ Since a cause of action *accrues* when the *elements* of the cause of action, including damage, occur (*Howard Jarvis Taxpayers Assn. v. City of La Habra, supra,* 25 Cal.4th 809, 815), the "appreciable and actual harm" that results in accrual must be harm of the specific type that is recoverable as damages on that type of cause of action. (*Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 209–210 [63 Cal.Rptr.2d 762].)

### 3. Negligence and Strict Liability Causes of Action

The strict liability causes of action alleged that defendants failed to warn consumers that lead was dangerous, gave "inadequate post-marketing warning and instruction of the dangers posed by Lead," and produced a defectively designed product that injured the class plaintiffs by causing them to incur costs for "inspecting, testing, and removing the hazards" and other unspecified damages.

The negligence cause of action alleged that defendants negligently "manufactured, designed, produced, processed, distributed, marketed, labeled, packaged, advertised, and sold" lead, causing injuries and damage to the class plaintiffs. The damage allegations were the same as those for the strict liability causes of action.

The cause of action for negligent breach of special duty alleged that defendants had falsely assured the public that lead was safe and had resisted efforts to regulate lead and require warnings. This cause of action alleged that defendants' conduct had caused "property damage," without further specificity.

 The elements of a negligence cause of action are duty, breach, causation and damages. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) The elements of a strict products liability cause of action are a defect in the manufacture or design of the product or a failure to warn, causation, and injury. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

 In this case, it is essentially indisputable that any breach of duty and any manufacturing or design defect or failure to warn occurred no later than 1978.[8] A cause of action for negligence or strict products liability therefore would accrue upon plaintiffs suffering injury as a result of defendants' wrongful conduct, and the limitations period would expire three years later.[9] (Code Civ. Proc., § 338, subd. (b).) Not just any damage will cause a strict liability or negligence cause of action to accrue. One thing is clear: economic loss alone, without physical injury, does not amount to the type of damage that will cause a negligence or strict liability cause of action to accrue. "In a strict liability or negligence case, the *compensable injury* must be *physical harm to persons or property*, not mere economic loss." (*Zamora v. Shell Oil Co.*, *supra*, 55 Cal.App.4th at p. 210, italics added.)

Since plaintiffs are public entities, not human beings, and are not authorized to sue on behalf of any human beings with respect to the strict liability and negligence causes of action, accrual of these causes of action depended on the occurrence of *physical injury* to plaintiffs' property. Defendants argue that the limitations period has expired because the only possible physical injury to plaintiffs' property was the original application of lead paint, which occurred decades before the initiation of this action. Plaintiffs claim that their property suffered physical injury when the lead paint subsequently deteriorated and "contaminated" their property.

Clearly the time of accrual of these causes of action is critical. Our examination of this issue leads us to the conclusion that the law does not support either of the positions taken by the parties. Plaintiffs' allegations of damage to their property do not include any allegations of physical injury (as that term has been construed), and therefore their causes of action for negligence and strict products liability, as alleged in the third amended complaint, *have never accrued.*

---

[8] While "post-marketing" failure to warn might conceivably have occurred later, there were no specific allegations that such an omission occurred within the limitations period. Regardless, this plays no role in our analysis, as a cause of action does not accrue in the absence of recoverable damages.

[9] We need not concern ourselves with the discovery rule here because we conclude that plaintiffs' causes of action have not accrued.

We begin our analysis with the California Supreme Court's decision in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125]. *Aas* involved construction defects lawsuits against the developers and contractors (whom we will refer to collectively as the developers) who had built a group of single- family homes and condominiums. (*Id.* at pp. 632–633.) The homeowners alleged causes of action for strict liability and negligence and sought the cost of repair and the diminution in value of their homes. (*Id.* at p. 633.) There was no claim of personal injury. (*Ibid.*) The developers sought an in limine order "excluding evidence of those alleged construction defects that have not caused property damage." (*Ibid.*) The homeowners acknowledged that many of the defects had not actually caused property damage, but they opposed the developers' request. The trial court issued an order barring evidence of defects "that have not resulted in bodily injury or physical property damage, i.e., [defects causing only] 'economic loss' . . . ." (*Id.* at p. 634.) The homeowners sought a writ of mandate overturning the order. (*Id.* at pp. 633–634.) The Court of Appeal denied relief, and the California Supreme Court granted review to decide "whether plaintiffs may state a cause of action for construction defects that have not caused property damage." (*Id.* at pp. 634–635.)

 The homeowners acknowledged that they could not recover on their strict liability cause of action for defects that had not caused property damage, but they asserted that they could recover in negligence. (*Aas v. Superior Court, supra,* 24 Cal.4th at p. 635.) The California Supreme Court began with the proposition that "[i]n actions for negligence, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone." (*Id.* at p. 636.) It cited *Seely v. White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145] in support of this proposition. *Seely* had held that recovery in strict liability and negligence actions is limited to damages for physical harm to person or property, and economic loss is not recoverable. (*Seely,* at p. 18.) *Aas* reaffirmed *Seely.* "Whatever the product, whether homes or automobiles, strict liability affords a remedy only when the defective product causes property damage or personal injury. The tort does not support recovery of damages representing the lost benefit of a bargain, such as the cost of repairing a defective product or compensation for its diminished value," although "property damage compensable in tort can exist when a defective component damages other parts of the same product." (*Aas v. Superior Court, supra,* 24 Cal.4th at pp. 639, 641.)

The homeowners argued that they should be allowed to recover economic losses on a special relationship theory. In discussing the multi-factor special relationship test, the California Supreme Court observed that the homeowners had not shown a high degree of certainty that they suffered injury. "Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of

' "appreciable harm" '—an essential element of a negligence claim." (*Aas v. Superior Court, supra,* 24 Cal.4th at p. 646.) "To say that one's house needs repairs costing a certain amount is not necessarily to say that one has suffered the type of harm cognizable in tort, as opposed to contract." (*Id.* at p. 646.)

*Aas* rejected the homeowners' argument that property damage should not be required because "to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive." (*Aas v. Superior Court, supra,* 24 Cal.4th at p. 649.) The five-justice majority also rejected the Chief Justice's proposal in his concurring and dissenting opinion that negligence recovery should be permitted for "*serious* defects and code violations posing a significant risk of death, personal injury, or considerable property damage." (*Id.* at p. 649.) "[W]hether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred." (*Id.* at p. 650.)

In this case, plaintiffs could properly maintain an action for damages based on negligence or strict liability only if they had suffered *physical injury to their buildings.*[10] Plaintiffs alleged only that paint containing lead pigment is harmful to *human beings.* Plaintiffs' general allegations in their complaint did not include any allegation of physical injury to their buildings. Plaintiffs alleged that they "must now pay for abatement programs to identify and then remove Lead" from their buildings. They alleged that they "have been forced to expend, are expending, and will expend money to inspect and test [their buildings] for Lead and to demolish, refurbish, or otherwise remedy the harmful effects of these properties." And plaintiffs alleged that their "Property Damage" from all of defendants' wrongful conduct consisted of "incurred costs for the abatement, removal, replacement, and/or remediation of Lead . . . ."

Plaintiffs' specific damages allegations in support of their strict liability and negligence causes of action also omitted any allegations of physical injury to plaintiffs' buildings. They sought recovery of the "costs of inspecting, testing, and removing the [Lead] hazards created by Defendants and the direct costs for the abatement, removal, replacement, and/or remediation of [their buildings]" and "increased costs for educational needs" they had to pay for those suffering from lead poisoning. Indeed, in opposition to defendants'

---

[10] We are speaking here of damage to some other component of the building. "California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) causes to other portions of a larger product (e.g., a house) into which the former has been incorporated." (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 483 [127 Cal.Rptr.2d 614, 58 P.3d 450].) Plaintiffs needed to allege that lead (or lead paint) had caused physical injury to some other component of their buildings. They did not.

summary judgment motion, plaintiffs conceded that their negligence and strict liability causes of action sought only "damages incurred in identifying and removing" the lead-based paint hazards from plaintiffs' properties.

 Plaintiffs' damages allegations amount to assertions that the *presence of lead paint or the presence of deteriorated lead paint* required them to *spend money to find and remove the lead paint.* "When the defect and the damage are one and the same, the defect may not be considered to have caused physical injury. [Citation.] The expenses of repair plaintiff has incurred, and will incur in the future, are purely economic damages." (*Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 [204 Cal.Rptr. 736].) Plaintiffs' damages allegations can only be characterized as seeking the cost of repairing plaintiffs' buildings. Plaintiffs have simply failed to allege that lead or lead paint *physically injured* their buildings. As *Aas* held, only physical injury can support a negligence or strict liability cause of action, and cost of repair does not constitute physical injury.

The two asbestos cases cited by the parties, both of which predate *Aas*, are not helpful to plaintiffs.

In *San Diego, supra,* 30 Cal.App.4th 575, the city alleged strict liability and negligence causes of action against the manufacturers of asbestos-containing building materials for damages to the city's buildings containing such materials.[11] (*Id.* at p. 582.) The city conceded that it had known for more than three years (the limitations period that the parties agreed was applicable) that asbestos was dangerous and that its buildings contained asbestos. (*Id.* at p. 581.) The manufacturers obtained summary judgment based on the statute of limitations.

On appeal, the city claimed that its causes of action had accrued during the three-year limitations period because the mere presence of asbestos in the buildings did not cause compensable damage until "a building becomes contaminated by sufficient asbestos fibers to pose a human health hazard." (*San Diego, supra,* 30 Cal.4th at p. 582.) The city apparently relied on a Missouri case that had held that a tort cause of action "accrues when sufficient asbestos fibers contaminate a building and cause a substantial and unreasonable risk of harm." (*Id.* at p. 582, citing *Kansas City v. W.R. Grace & Co.* (Mo.Ct.App. 1989) 778 S.W.2d 264.)

Without considering the validity of the city's reliance on the Missouri case, the Second District held that the city's causes of action were barred by the

---

[11] These causes of action were in addition to the city's nuisance cause of action.

statute of limitations. Since the city sought the cost of "testing, inspecting, safeguarding, and abating" the asbestos in *all* of its buildings, it could not avoid the bar of the statute of limitations by seeking recovery only for those buildings that had become contaminated during the limitations period. The city's complaint alleged that asbestos dust had been "continuously" released since the installation of the materials, thereby admitting, in the Second District's view, that appreciable harm had occurred more than three years earlier. It followed that the strict liability and negligence causes of action were barred by the statute of limitations. (*San Diego, supra,* 30 Cal.App.4th at p. 583.)

*San Diego* is of no assistance here. The Second District avoided resolving the question of *when or if* accrual had occurred for the city's strict liability and negligence causes of action. Instead, *San Diego* relied on the fact that the city, by asserting that asbestos contamination was the alleged physical injury for which it sought relief and alleging that some contamination had occurred more than three years earlier, had essentially conceded that the statute of limitations barred its action even if contamination constituted physical injury and resulted in the accrual of the city's causes of action.

The issue of when a cause of action for asbestos contamination accrues was addressed by the First District in *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318 [44 Cal.Rptr.2d 305] (*SFUSD*). SFUSD filed a strict liability and negligence action against asbestos manufacturers. SFUSD alleged that six of SFUSD's school buildings had been constructed with asbestos-containing building materials more than a decade earlier. (*Id.* at p. 1323.) Some of these materials had deteriorated and released asbestos fibers that allegedly "caused physical injury to its schools and posed a potential hazard to building users and visitors." (*Ibid.*) SFUSD alleged that it had not discovered that the fibers had been released until many years later. (*Id.* at pp. 1323–1324.) SFUSD sought recovery of, among other things, the cost "to repair that damage." (*Id.* at p. 1323.) The manufacturers sought summary judgment based on the statute of limitations. (*Id.* at p. 1324.) The trial court granted the motion on the ground SFUSD had discovered its cause of action when it knew that its buildings *contained asbestos,* not when it discovered that the fibers had been released. (*SFUSD,* at p. 1324.)

On appeal, the First District asserted that "asbestos cases are unique in the law" and "[t]he nature of the defect and the damage caused by asbestos differs from the defects and damages found in most other strict liability and negligence cases." (*SFUSD, supra,* 38 Cal.App.4th at p. 1325.) "[I]n the typical asbestos-in-building case, the identity of the tort-feasor is known as is the fact that the building materials contain asbestos. What the plaintiff does not know is when the asbestos will become harmful—when it might injure those

who occupy the building." (*Ibid.*) "The physical danger to persons occupying a building containing asbestos begins when asbestos fibers become airborne. Respirable asbestos fibers may be released from friable asbestos-containing materials when these materials are disturbed." (*Ibid.*) "Thus, the timing problem unique to asbestos cases leads us to the unusual inquiry posed by this appeal—when does 'injury' occur such that a strict liability or negligence cause of action accrues and the limitations period commences in an asbestos-in-building case?" (*Ibid.*)

The First District acknowledged that a "threat of future harm not yet realized . . . normally does not suffice to create a cause of action." (*SFUSD, supra,* 37 Cal.App.4th at p. 1326.) "The dangerousness that creates a risk of harm alone has been held to be insufficient to support an award of damages—there must be physical harm caused by that product." (*Id.* at pp. 1328–1329.) "Until physical injury occurs—until damage rises above the level of mere economic loss—a plaintiff cannot state a cause of action for strict liability or negligence." (*Id.* at p. 1327.)

The First District noted that the courts in some other jurisdictions "routinely find that asbestos contamination constitutes the physical injury element of strict liability or negligence causes of action in an asbestos-in-building case." (*SFUSD, supra,* 37 Cal.App.4th at p. 1328.) "At the release of asbestos fibers into the environment, the cause of action has been held to accrue and the statute of limitations to begin to run. [Citation to out-of-state case.] The injury for which asbestos plaintiffs are being recompensed has been found to be the contamination of their buildings, not the mere presence of asbestos. [Citation to federal case.] The injury has been found to be the contamination of public buildings with asbestos fibers which endanger the lives and health of the building's occupants." (*Id.* at p. 1329.)

The First District reasoned that, because "the risk of contamination endangering a building's occupants is not the type of risk that is normally allocated between parties to a contract by agreement," "[i]n order to be consistent with the principles of *Seely,* it appears that until contamination occurs, the only damages that arise are economic losses that do not constitute physical injury to property recoverable in strict liability or negligence." (*SFUSD, supra,* 37 Cal.App.4th at p. 1330.) "Physical injury resulting from asbestos contamination, not the mere presence of asbestos, must have occurred before a cause of action for strict liability or negligence can accrue in an asbestos-in-building case and the limitations period [can] commence." (*Ibid.*)

"If the mere presence of asbestos constitutes only a threat of future harm, we may conclude that asbestos contamination is the appreciable harm that forms the damage element of a strict liability or negligence cause of action. This analysis would allow us to fashion a rule that is consistent with both lines of

California Supreme Court authority—the *Seely* cases on physical injury in a strict liability or negligence context and the cases allowing the commencement of the statute of limitations once any appreciable harm has been realized." (*SFUSD, supra,* 37 Cal.App.4th at p. 1330.)

The First District conceded that "the act of testing and investigating which discloses no contamination cannot be equated with the actual harm of contamination. At best, such testing and investigation could show a threat of future harm. In light of the 'threat of future harm' cases and the unique analytical problems posed by an asbestos-in-building case, we may reasonably conclude that the California Supreme Court did not intend such a result. These expenses may be found to have been undertaken to determine when the threat of future harm ripens into appreciable, actual harm for purposes of the accrual of a tort cause of action." (*SFUSD, supra,* 37 Cal.App.4th at pp. 1331–1332.) "[W]e hold that in an asbestos-in-building case, the mere presence of asbestos constitutes only a threat of future harm. Contamination by friable asbestos is the physical injury and the actual, appreciable harm that must exist before a property owner's strict liability or tort cause of action against an asbestos manufacturer accrues and the limitations period commences."[12] (*SFUSD, supra,* 37 Cal.App.4th at p. 1335.)

The First District acknowledged in *SFUSD* that "dangerousness that creates a risk of harm alone" could not constitute physical injury for purposes of a negligence or strict liability cause of action, but it nevertheless held that a *building* suffers *physical injury* when the building becomes *hazardous to human beings.* (*SFUSD, supra,* 37 Cal.App.4th at pp. 1325, 1328–1329.) Under *Aas,* however, physical injury to a building cannot be established by evidence that the defects pose a physical danger to human beings. (*Id.* at pp. 1328–1329.) *Aas* explicitly rejected the notion that "serious defects . . . posing a significant risk of death, personal injury, or considerable property damage" could constitute physical injury for purposes of a negligence or strict liability cause of action. (*Aas v. Superior Court, supra,* 24 Cal.4th at p. 649.) "[W]hether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred." (*Id.* at p. 650.) Plaintiffs insist that, similar to the asbestos contamination in *SFUSD,* the *deterioration* of lead paint, which exposes the lead to human ingestion, constitutes a physical injury to its buildings such as will support a negligence or strict liability cause of action. However, we cannot reconcile this holding with the holding in *Aas* that serious defects posing a significant risk of injury to human beings do not constitute physical

---

[12] *Aas* cited *SFUSD* but did not expressly or implicitly approve of its holding that asbestos contamination *is physical injury. Aas* only implied approval of *SFUSD*'s holding that the mere presence of asbestos *is not physical injury.* (*Aas v. Superior Court, supra,* 24 Cal.4th at pp. 640, 646.)

injury to property. To the extent that plaintiffs' position, which is based on the holding in *SFUSD,* is inconsistent with *Aas,* we are bound by *Aas.*[13] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

While plaintiffs have adequately alleged that the presence of deteriorated lead paint poses an unreasonable danger to human beings, they have made no allegations that the deteriorated lead paint even threatens *the buildings themselves* with physical injury. They have not alleged that deteriorated lead paint causes the walls or floors of the structure to themselves deteriorate or in any other way causes damage to the physical components of plaintiffs' buildings other than the lead paint. While a human being who had suffered lead poisoning as a result of exposure to deteriorating lead paint in plaintiffs' buildings might have a viable negligence or strict liability cause of action that is not vulnerable to a statute of limitations defense, plaintiffs, as the owners of structures simply containing deteriorated lead paint, do not.

We must therefore conclude that, as pleaded, plaintiffs' negligence and strict liability causes of action simply have not accrued because plaintiffs have failed to plead the existence of any physical injury to their buildings. While we reach this conclusion in the context of our analysis of the propriety of the superior court's ruling on defendants' summary judgment motion, it does not dictate that defendants were entitled to prevail on that motion.

"[T]he trial court has the inherent power to grant summary judgment on a ground not explicitly tendered by the moving party when the parties' separate statements of material facts and the evidence in support thereof demonstrate the absence of a triable issue of material fact put in issue by the pleadings and negate the opponent's claim as a matter of law. [Citations.] [¶] However, when the trial court grants a summary judgment motion on a ground of law not explicitly tendered by the moving party, due process of law requires that the party opposing the motion must be provided an opportunity to respond to the ground of law identified by the court and must be given a chance to show there is a triable issue of fact material to said ground of law. [¶] Otherwise, a party which could have shown a triable issue of material fact put in issue by the complaint or answer but neglected to do so because the point was not asserted by the moving party as a ground for summary judgment would be deprived unjustly of the chance to demonstrate the existence of a triable issue of material fact which requires the process of trial. Moreover, if the dispositive ground of law was not asserted in the trial court by the moving party and

---

[13] We do not necessarily question the result in *SFUSD.* SFUSD alleged that the released asbestos fibers had "caused physical injury to its schools" within the limitations period and it sought the cost "to repair that damage." (*SFUSD, supra,* 37 Cal.App.4th at p. 1323.) If SFUSD could prove that the asbestos fibers damaged other components of its building during the limitations period, its negligence and strict liability causes of action might succeed.

the record fails to establish that the opposing party could not have shown a triable issue of material fact had the ground of law been asserted by the moving party, a reviewing court ordinarily cannot determine if the trial court's decision was correct." (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 70–71 [15 Cal.Rptr.2d 598].)

 Defendants' summary judgment motion was based solely on the statute of limitations, and they did not assert that plaintiffs had failed to state a cause of action due to the absence of allegations of physical injury to their buildings. Plaintiffs were given no opportunity to respond to defendants' motion on that unstated ground below (although we have given them the opportunity to do so on appeal), so it would be inappropriate for us to uphold the superior court's ruling on this ground.[14] We will therefore order the superior court to vacate its order as to these causes of action and deny defendants' motion in this regard.

## 4. Fraud

Plaintiffs alleged the same damages as to the fraud cause of action as they alleged as to the negligence and strict products liability causes of action, and the limitations period is the same length for all three causes of action. (Code Civ. Proc., § 338, subds. (b), (d).) Thus, if the economic loss doctrine applies to plaintiffs' cause of action for fraud, this cause of action, like the others, has never accrued. Because the application of the economic loss doctrine to plaintiffs' fraud cause of action depends on our interpretation of the California Supreme Court's recent decision in *Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979 [22 Cal.Rptr.3d 352, 102 P.3d 268] (*Robinson*), we turn to this question first.

*Robinson* was a breach of contract and fraud action. Dana and Robinson had contracted for Dana to supply a part for Robinson's helicopters. Their contract required the part to be manufactured to certain specifications and prohibited changes to the manufacturing process without approval. When it delivered the parts, Dana provided Robinson with certificates required by the Federal Aviation Administration (FAA). These certificates asserted that the parts had been manufactured to the requisite specifications. (*Robinson Helicopter Co. v. Dana Corp., supra,* 34 Cal.4th at pp. 985–986.) After a couple of years, Dana changed its manufacturing process so that the parts did not meet Robinson's specifications and did not comport with the required certificates. However, Dana continued to supply the required certificates and did not tell Robinson about the change. (*Id.* at p. 986.) After more than a year

---

[14] We express no opinion on the merits of a motion for judgment on the pleadings or a motion for summary adjudication on this ground.

of supplying the nonconforming parts, Dana switched back to the original manufacturing process that met the required specifications. It did not notify Robinson of this change either. (*Ibid.*)

Eventually, Robinson's helicopters began to experience a high failure rate for this part. (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 986.) It was only after Robinson complained to Dana about the high failure rate that Dana disclosed that the parts were nonconforming. (*Id.* at pp. 986–987.) The defective parts did not cause any physical injury to person, property or other components of the helicopters. However, Robinson was required to recall and replace the nonconforming parts. And Dana was not very cooperative in providing the information necessary to identify the nonconforming parts so that they could be rapidly replaced. (*Ibid.*) Robinson incurred more than $1.5 million in expenses for replacement parts and employee time spent investigating the matter, identifying the nonconforming parts and replacing them. (*Id.* at p. 987.)

The jury found that Dana had breached its contract with Robinson, breached the warranties, and committed fraud. (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at pp. 987–988.) It awarded Robinson nearly all of its claimed expenses as compensatory damages and also awarded Robinson $6 million in punitive damages. (*Id.* at p. 987.) The Court of Appeal held that Robinson had no tort action (and therefore could not recover punitive damages) because it had suffered only economic loss. (*Id.* at p. 988.) The California Supreme Court granted review to decide that issue. (*Ibid.*)

The court held that Dana's provision of false certificates of conformance supported a cause of action for fraud even absent physical injury. (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 988.) Initially, the court noted that the economic loss rule was intended to separate contract from tort. (*Ibid.*) " '[T]he economic loss rule allows a plaintiff to recover in strict products liability in tort when a product defect causes damage to "other property", that is, property *other than the product itself.* The law of contractual warranty governs damage to the product itself.' " (*Id.* at p. 989.)

Robinson claimed that its fraud cause of action was permitted because it arose independently from the contract breach: the contract was breached by the supply of nonconforming parts; the fraud was providing false certificates claiming that the parts conformed. (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 989.) Dana argued that its fraud was not independent of the breach of contract. (*Id.* at p. 992.) The court concluded that, because Robinson had relied on the certificates and its lack of knowledge of the nonconformity had led to economic loss and exposed Robinson to liability if

any of the affected helicopters failed and caused physical injury, the fraud was "independent" of the breach. (*Id.* at pp. 990–991.)

The court then reasoned that the economic loss rule did not bar Robinson's fraud cause of action "*because* [the fraud cause of action was] independent of Dana's breach of contract." (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 991, italics added.) " 'Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for "predictability about the cost of contractual relationships," . . . fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the bargain damages.' " (*Id.* at p. 992, citation omitted.)

" '. . . [a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract.' . . . No rational party would enter into a contract anticipating that they are or will be lied to. 'While parties, perhaps because of their technical expertise and sophistication, can be presumed to understand and allocate the risks relating to negligent product design or manufacture, those same parties cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction.' . . . Dana's argument therefore proposes to increase the certainty in contractual relationships by encouraging fraudulent conduct at the expense of an innocent party. No public policy supports such an outcome. [¶] Nor do we believe that our decision will open the floodgates to future litigation. Our holding today is narrow in scope and limited to a defendant's affirmative misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 993, citations and fn. omitted.)

The determination of whether the economic loss rule applies to plaintiffs' fraud cause of action depends on whether the California Supreme Court intended in *Robinson* to obviate the application of the economic loss rule to *all* intentional affirmative fraud causes of action where the fraud exposes the plaintiff to liability or the court intended to provide a *narrow exception* to the economic loss rule that applies only where that fraud cause of action *also* accompanies, but is independent of, a breach of contract cause of action. We believe that the California Supreme Court's decision in *Robinson* precludes the application of the economic loss rule to any intentional affirmative fraud action where the plaintiff can establish that the fraud exposed the plaintiff to liability.

The structure of the *Robinson* opinion supports this conclusion. The first part of the *Robinson* opinion was concerned with whether Dana's wrongful conduct constituted tortious conduct, not whether the economic loss rule

applied to it. It was only *after* the court held that Dana's conduct was a tort independent of Dana's breach of contract that the court addressed the application of the economic loss rule. (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 991.) The analysis that followed suggested that fraud *itself* is immune from application of the economic loss rule because fraud is particularly blameworthy and therefore unlike both contract causes of action *and* products liability causes of action. Although the court suggested that its decision was a narrow one, its explicit limits did not exclude a fraud cause of action such as the one pleaded by plaintiffs.

Here, plaintiffs alleged that defendants' affirmative misrepresentations about the dangers of low-level lead exposure, upon which they justifiably relied, had caused plaintiffs to fail to make timely efforts to prevent and treat low-level lead exposure. The delay in instituting prevention and treatment caused more people to be exposed and increased the cost of treatment for those who had been exposed or continued to be exposed. In addition, plaintiffs, as the owners of numerous buildings containing unremediated lead, continued to expose people to low levels of lead that plaintiffs believed were not harmful due to defendants' misrepresentations. These people who were exposed to low levels of lead in plaintiffs' buildings may hold plaintiffs liable for the permanent damage to their bodies that no amount of prevention or treatment can now completely remediate. Thus, plaintiffs' potential liability to these people is independent of the economic harm to plaintiffs from the additional costs of prevention and treatment. Accordingly, we conclude that the economic loss doctrine does not apply to plaintiffs' fraud cause of action, and we proceed to address whether defendants established that plaintiffs' fraud cause of action had accrued more than three years prior to the March 2000 filing of the original complaint. (Code Civ. Proc., § 338, subd. (d) [three-year limitations period for fraud].)

"The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co. v. Dana Corp.*, *supra*, 34 Cal.4th at p. 990.) A cause of action accrues when the last element of the tort occurs or when the plaintiffs discover that they have suffered appreciable harm and its cause. (*Jolly v. Eli Lilly & Co.*, *supra*, 44 Cal.3d 1103, 1109; *Howard Jarvis Taxpayers Assn. v. City of La Habra*, *supra*, 25 Cal.4th at p. 815; *Budd v. Nixen*, *supra*, 6 Cal.3d at p. 201.)

Plaintiffs alleged that defendants had "made false representations, concealments, and nondisclosures to the public" with knowledge of their falsity and with the intent to deceive the public and induce an absence of regulations and preventive action to stop the use of lead. Many of plaintiffs' specific

allegations of false representations were from long ago and related to defendants' efforts to avoid a ban on lead paint. Defendants had known about the dangers of lead for nearly a century but had engaged in "a concerted effort to hide the dangers of Lead" from the government and the public. For many years, defendants promoted lead paint for interior use and claimed that it was safe.

These allegations could not provide a basis for an unbarred fraud cause of action because plaintiffs conceded below that it was "generally recognized" in 1978, and known to them at that time, that lead paint itself was a "poison" and a "hazard." Defendants' efforts to avoid regulation and to combat the move to ban lead paint had failed by 1978, so the misrepresentations that fueled that effort could not form a basis for an unbarred fraud cause of action. Plaintiffs could not have justifiably relied on any post-1978 representations that lead paint was safe for interior use, was not hazardous or poisonous or should not be regulated or banned.

But there were other allegations that were not barred simply by plaintiffs' knowledge that lead paint was hazardous. Plaintiffs alleged that defendants had made affirmative misrepresentations that "minimize[d]," and were continuing to minimize, the danger created by lead "so that Plaintiffs and the Class have been unaware until recently of the dangers of low-level exposure to Lead and the nature and extent of the Lead problem."[15] And plaintiffs alleged that defendants used misrepresentations to oppose government efforts to combat lead poisoning from lead paint by, among other things, claiming that lead poisoning was attributable to sources other than lead paint. It was only in 1998 that scientific studies demonstrated the falsity of defendants' representations and proved that even very low levels of exposure to lead paint could cause serious damage to fetuses, children and adults. Plaintiffs alleged that, until these studies demonstrated the falsity of defendants' misrepresentations, those misrepresentations had prevented plaintiffs from being able to "gather the resources, along with the scientific knowledge" to prevent and treat low-level lead contamination. These misrepresentations were made with the intent to induce plaintiffs to "[fail] to take early prevent[ive] action . . . ." Plaintiffs alleged that they "suffered and continue to suffer economic losses and other general and specific damages including, but not limited to, extra educational expenses and abatement costs, amounts which could have been saved if the truth had been told . . . ."

---

[15] Not all of these allegations seemed likely to influence plaintiffs, as opposed to the public. Plaintiffs alleged that defendant Lead Industries Association (LIA) had distributed a 1999 video on childhood lead poisoning prevention that "minimizes and misrepresents the dangers posed by Lead and the ways to avoid Lead exposure." The video was immediately attacked by environmental groups as misleading and "possibly dangerous." However, LIA continued to publish such information on its Web site.

The alleged misrepresentations refuting and concealing evidence that low levels of lead exposure could be hazardous were sufficient to support an unbarred fraud cause of action. A fraud cause of action based on *these representations* required plaintiffs to prove that (1) defendants knew low levels of lead exposure were hazardous, (2) defendants falsely represented that low levels of lead exposure were not hazardous, (3) defendants intended to induce plaintiffs' reliance on their representations, (4) plaintiffs did not know low levels of lead exposure were hazardous and justifiably relied on defendants' misrepresentations, and (5) plaintiffs suffered damages as a result of their reliance.

The third amended complaint adequately alleged the first three elements. Plaintiffs also adequately alleged that they were unaware of the falsity of these particular representations until approximately 1998 when scientific studies were published disclosing the dangers of low-level lead exposure. Although it is undisputed that plaintiffs had known for decades that lead was poisonous, their lack of knowledge of the dangers of *low-level lead exposure* allegedly prevented them from instituting adequate programs to prevent and treat such low-level exposure even though at the same time they were trying to prevent and treat higher levels of exposure. The continuation of the low-level exposure increased the damage to those exposed and thereby increased the cost of treatment that plaintiffs were obligated to provide. Defendants did not attempt to establish in support of their summary judgment motion that plaintiffs were aware of the falsity of these specific representations prior to 1998.[16] Consequently, the discovery rule tolled the accrual of the fraud cause of action until 1998, and plaintiffs filed their action within the three-year limitations period.

The economic loss doctrine does not apply to plaintiffs' fraud cause of action, and defendants have failed to establish that, prior to 1998, plaintiffs were aware of the falsity of defendants' misrepresentations about the hazards of low-level lead exposure. The superior court therefore erred in summarily adjudicating the fraud cause of action in favor of defendants on statute of limitations grounds.

### 5. UCL

The UCL cause of action in the third amended complaint was brought by SF on behalf of the People. It alleged that defendants' "wrongful conduct, false representations, concealments, and nondisclosures . . . constitute unlawful, unfair, and/or deceptive business practices" that should be enjoined to

---

[16] Defendants' separate statement was narrowly focused on the issue of when plaintiffs became aware that their buildings contained lead and knew that lead was hazardous.

prevent irreparable harm. Restitution, disgorgement and civil penalties were also sought. The UCL allegations made no mention of business practices involving nonleaded paint or surface preparation warnings. The limitations period for the UCL cause of action was four years. (Bus. & Prof. Code, § 17208.)

Plaintiffs argued in opposition to the summary judgment motion that their UCL cause of action was not time-barred because defendants had continuously misrepresented the dangers of lead paint to the present day. They also asserted that their UCL cause of action was not time-barred because, during the limitations period, defendants had sold nonleaded paint without adequate warnings to consumers of the dangers of sanding lead paint during surface preparation for the use of nonleaded paint. Even if defendants were currently providing surface preparation warnings, plaintiffs argued that the UCL cause of action was viable because civil penalties for defendants' past failures could be imposed. Defendants asserted in reply that plaintiffs could not base their UCL claim on the absence of surface preparation warnings on nonleaded paint because this was not alleged in the third amended complaint.

At the summary judgment hearing, plaintiffs repeated their argument that defendants were liable because, within the limitations period, they had sold nonleaded paint without adequate surface preparation warnings. They also again argued that current adequate warnings did not preclude civil penalties for past failures. Defendants repeated their assertion that this theory was barred because it was not alleged in the third amended complaint. The court found that plaintiffs had not alleged anything regarding nonleaded paint and that the remaining allegations related to facts that plaintiffs had knowledge of more than four years before filing suit.

Plaintiffs implicitly concede on appeal that defendants ceased selling lead paint decades ago and therefore their business practices in connection with the sale of lead paint did not occur within the limitations period. They argue that the superior court erred in "narrowly constru[ing]" the third amended complaint and relying on the absence of any allegations regarding "lead free products." Plaintiffs contend that their UCL cause of action was not time-barred because, during the limitations period, defendants "continu[ed to] fail[] to place warnings on lead-free paint products used to re-paint lead-painted surfaces . . . ."

"The burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint.* A 'moving party need not ". . . refute liability on some theoretical possibility not included in the pleadings." [Citation.]' . . . ' "[A] motion for summary judgment must be directed to the *issues raised by the pleadings.*

The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings." ' " (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1342 [67 Cal.Rptr.2d 726], citation omitted, second italics added.) "Declarations in opposition to a motion for summary judgment 'are no substitute for amended pleadings.' . . . If the motion for summary judgment presents evidence sufficient to disprove the plaintiff's claims, as opposed to merely attacking the sufficiency of the complaint, the plaintiff forfeits an opportunity to amend to state new claims by failing to request it." (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1664 [42 Cal.Rptr.2d 669], citation omitted.)

Defendants' motion sought to establish that the UCL cause of action alleged in the third amended complaint was time-barred. The third amended complaint, including the UCL cause of action, was directed at a group of defendants that manufactured and distributed lead. It contained no allegations regarding those that manufactured and distributed lead-free products.[17] Our recognition that the third amended complaint's UCL cause of action does not purport to allege a cause of action against those that manufacture and distribute lead-free products is not a narrow construction of the pleading. It is the only logical construction that can be afforded a pleading that is solely concerned with lead and those that manufactured and distributed it.

As plaintiffs do not assert that their UCL cause of action was not time-barred as to business practices involving the manufacture and distribution of *lead* (the cause of action pleaded in their third amended complaint), they have not established that the superior court's ruling on the UCL cause of action was erroneous.

### III. Disposition

The judgment is reversed. The superior court is directed to (1) vacate its order sustaining the demurrer to the representative public nuisance cause of action in the third amended complaint and enter a new order overruling the demurrer to that cause of action, and (2) vacate its order granting summary judgment and enter a new order granting summary adjudication on the UCL cause of action and denying summary adjudication on the negligence, strict liability and fraud causes of action. Plaintiffs shall recover their costs on appeal.

Bamattre-Manoukian, Acting P. J., concurred.

---

[17] Some defendants do sell nonleaded paint, but all of plaintiffs' allegations grouped defendants together collectively.

**McADAMS, J.,** Concurring.—As the majority observes, plaintiffs contend on appeal that the trial court erred: (1) in sustaining demurrers to their public nuisance claims; (2) in denying them leave to amend to allege trespass; and (3) in granting summary judgment on their remaining causes of action for strict products liability, negligence, fraud, and unfair competition. Addressing those contentions, the majority (1) agrees in part with the first contention, concluding that the representative plaintiffs, seeking abatement only, stated a cause of action for public nuisance; (2) disagrees with plaintiffs' second contention, concluding that the trial court properly denied leave to amend to assert trespass; and (3) agrees in part with plaintiffs' third contention, reversing summary judgment as to plaintiffs' causes of action for strict products liability, negligence, and fraud, but not as to their unfair competition claim.

I concur in the result reached by the majority, and I am in accord with much of its analysis. I write separately because I respectfully disagree with the majority's reasoning on several points.

## I. JUDGMENT AFTER DEMURRER: THE REPRESENTATIVE PUBLIC NUISANCE CAUSE OF ACTION

I join with my colleagues in holding that allegations of affirmative promotion of the hazardous use of a product can form the basis of a public nuisance cause of action for abatement, as brought here by the three public entities on behalf of the People.

However, I disagree with one aspect of the majority's analysis. The majority opinion impliedly accepts the argument that a public nuisance cause of action *for abatement* could never be based on the "mere manufacture and distribution" of a dangerous product or the "failure to warn of its hazards." (Maj. opn., *ante*, at p. 310.) I write separately to express my view that there may be circumstances, not appearing in the pleadings currently before us, where a public entity could successfully plead such a nuisance action, particularly where the product is widely recognized as hazardous; the defendant or defendants are clearly responsible for manufacturing, producing or supplying the defective product or failing to warn of its dangers; the product poses a significant and imminent risk of death, serious injury or major property damage; and the remedy sought is abatement rather than damages. Where such a "ticking time bomb" exists, a products liability action, requiring injury before relief, offers no shield. An entity charged with protecting the public should not have to wait for the destructive results before taking action.

## II. *DENIAL OF LEAVE TO AMEND: PROPOSED CAUSE OF ACTION FOR TRESPASS*

I agree with the majority's view of the parties' contentions concerning the plaintiffs' proposed cause of action for continuing trespass.

## III. *GRANT OF SUMMARY JUDGMENT*

### A. *The Strict Liability And Negligence Causes Of Action*

I disagree with my colleagues' analysis as it relates to plaintiffs' strict products liability and negligence causes of action. The majority concludes that those claims have not yet accrued, based on the lack of physical injury to plaintiffs' buildings and thus the absence of appreciable harm. (Maj. opn., *ante*, at p. 325.) In reaching that conclusion, the majority rejects *San Francisco Unified School Dist. v. W. R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1333 [44 Cal.Rptr.2d 305] (*SFUSD*). It does so on the ground that *SFUSD* is inconsistent with the California Supreme Court's opinion in *Aas v. Superior Court* (2000) 24 Cal.4th 627 [101 Cal.Rptr.2d 718, 12 P.3d 1125] (*Aas*).) I find no such inconsistency. Moreover, I believe that *SFUSD* is well reasoned and persuasive. I would apply it in this case.

In explaining my divergence from the majority, I begin with the fundamental legal principles that govern here.

#### 1. *Governing Principles*

##### a. *Elements of the causes of action*

As the majority correctly observes, the elements of a negligence claim are wrongdoing (duty and breach), causation, and damages. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) The elements of a cause of action for strict products liability are wrongdoing (a defect in design or manufacture, or a failure to warn), causation, and damages. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

It is important to distinguish wrong from harm; "in unusual cases, a plaintiff may be aware of wrongdoing before damage arises." (*SFUSD, supra,* 37 Cal.App.4th at p. 1333.) But the cause of action is not complete until there is damage: "appreciable, nonspeculative, present injury is an essential element of a tort cause of action." (*Aas, supra,* 24 Cal.4th at p. 646; accord, *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 483 [127 Cal.Rptr.2d 614, 58 P.3d 450] (*Jiminez*).)

### b. *Statute of limitations*

"The resolution of a statute of limitations defense is typically a factual question for the trier of fact. However, summary judgment is proper if the court can draw only one legitimate inference from uncontradicted evidence about the limitations issue." (*SFUSD, supra,* 37 Cal.App.4th at pp. 1325–1326.)

Generally speaking, the limitations period commences when all the necessary elements of the cause of action are in place; however, accrual may be delayed until the plaintiff's later discovery of the wrong and its cause. (See *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111 [245 Cal.Rptr. 658, 751 P.2d 923] [discovery rule in personal injury action].) "In tort actions, the statute of limitations commences when the last element essential to a cause of action occurs." (*SFUSD, supra,* 37 Cal.App.4th at p. 1326.) Where the last essential element is damage, "the infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period." (*Davies v. Krasna* (1975) 14 Cal.3d 502, 514 [121 Cal.Rptr. 705, 535 P.2d 1161].)

### c. *Appreciable Harm*

Appreciable harm may result from either (i) physical property damage or (ii) involuntary out of pocket losses. (See *Aas, supra,* 24 Cal.4th at p. 646.) In contrast to the opinion of my colleagues in the majority, I believe both are present here.

### (i) *Property Damage*

As the court in *SFUSD* explained: "As the limitations period cannot begin to run until damage occurs, we must consider what constitutes the element of damage for purposes of strict liability and negligence. In a landmark strict liability case that has since achieved nationwide influence, the California Supreme Court ruled that plaintiffs may recover in tort for physical injury to person or property, but not for purely economic losses that may be recovered in a contract action. (*Seely v. White Motor Co.* [(1965)] 63 Cal.2d [9], 18–19 [45 Cal.Rptr. 17, 403 P.2d 145] [*Seely*].) Since *Seely* was announced 30 years ago, other California courts have applied the same reasoning to other tort causes of action, such as negligence." (*SFUSD, supra,* 37 Cal.App.4th at p. 1327.) *Seely's* "reasoning ultimately outlined the framework of our economic loss rule, which the United States Supreme Court later adopted in large part for purposes of tort liability under admiralty jurisdiction." (*Jimenez, supra,* 29 Cal.4th at p. 482.)

The economic loss rule—as outlined more than forty years ago in *Seely*— was recently reaffirmed by the California Supreme Court, in its 2000 decision

in *Aas*, and again in the 2002 *Jiminez* case. (See *Aas, supra,* 24 Cal.4th at pp. 632, 639, 646; *Jimenez, supra,* 29 Cal.4th at p. 483.) Under that rule, "recovery under the doctrine of strict liability is limited solely to 'physical harm to person or property.' " (*Jimenez*, at p. 482, quoting *Seely, supra,* 63 Cal.2d at p. 18.) "*Seely* has been widely cited in federal, California and other state decisions for this physical injury/economic loss distinction in tort/contract cases." (*SFUSD, supra,* 37 Cal.App.4th at p. 1328.)

Applying the general principles in *Seely*, the SFUSD court said this: "Until physical injury occurs—until damage rises above the level of mere economic loss—a plaintiff cannot state a cause of action for strict liability or negligence." (*SFUSD, supra,* 37 Cal.App.4th at p. 1327.) "Once physical injury to property occurs—assuming that damage is the last element of the tort cause of action to occur—the cause of action accrues and the limitations period commences." (*Id.* at p. 1329.) In the particular case before it, the court observed: "The injury for which asbestos plaintiffs are being recompensed has been found to be the contamination of their buildings, not the mere presence of asbestos." (*Ibid.*)

*SFUSD* is one of at least two California cases to distinguish between the mere presence of a toxic substance in a structure (an economic loss) and contamination of the structure by that substance (physical injury). (*SFUSD, supra,* 37 Cal.App.4th 1318 [asbestos in buildings]; (*Transwestern Pipeline Co. v. Monsanto Co.* (1996) 46 Cal.App.4th 502, 527 [53 Cal.Rptr.2d 887] (*Transwestern*) [PCB's in pipelines].) Under the reasoning of those cases, "economic loss occurs when the toxic substance is merely present but property damage occurs when the toxic substance actually contaminates the plaintiff's property." (*Transwestern*, at p. 527, citing *SFUSD, supra*, at pp. 1323–1324.)

Thus, the court in *SFUSD* explained: "In order to be consistent with the principles of *Seely*, it appears that until contamination occurs, the only damages that arise are economic losses that do not constitute physical injury to property recoverable in strict liability or negligence. Physical injury resulting from asbestos contamination, not the mere presence of asbestos, must have occurred before a cause of action for strict liability or negligence can accrue in an asbestos-in-building case and the limitations period commence." (*SFUSD, supra,* 37 Cal.App.4th at p. 1330.) Similarly, in the *Transwestern* case, the court agreed with the plaintiff's contention that "PCB contamination constituted property damage, not economic loss," finding that argument to be "supported by California cases as well as cases from other jurisdictions." (*Transwestern, supra,* 46 Cal.App.4th at p. 527.) As the *Transwestern* court explained, the harm for which plaintiff was seeking indemnity "was clearly in the nature of property damage because the PCB's contaminated . . . pipelines and the condensate within the pipelines, both of

which were the property of [plaintiff's customer]. In this respect at least we see no distinction between PCB contamination and asbestos contamination." (*Id.* at p. 530.)

As I see it, *SFUSD* is not inconsistent with *Aas.* I therefore disagree with the majority's contrary conclusion. (Maj. opn., *ante*, at p. 324.) I offer two reasons for that view.

First, the relevant principles in *Aas* are not new. As pertinent here, the *Aas* court simply reaffirmed its 1965 decision in *Seely.* (*Aas, supra,* 24 Cal.4th at pp. 632, 639, 646.) *SFUSD* explicitly followed *Seely.* (*SFUSD, supra,* 37 Cal.App.4th at pp. 1324–1325, 1330; see also *Transwestern, supra,* 46 Cal.App.4th at p. 527.) Because *SFUSD* is faithful to the principles announced in *Seely*, it likewise is in harmony with *Aas.*

Furthermore, the *Aas* decision makes two references to *SFUSD* to support its analysis, implicitly endorsing the earlier case. (*Aas, supra,* 24 Cal.4th at pp. 640, 646.) In each reference, the high court recognizes the appellate court's distinction between the mere presence of asbestos in a building and contamination of the building resulting from release of the asbestos. The court's first citation thus reads: "In *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327–1330 [44 Cal.Rptr.2d 305], a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated the buildings by releasing friable asbestos." (*Id.* at p. 640.) In its second citation, the court says "see *San Francisco Unified School Dist. v. W.R. Grace & Co., supra,* 37 Cal.App.4th 1318, 1327–1331 [the presence of asbestos products in buildings did not, prior to the release of friable asbestos, constitute actual and appreciable harm under *Davies v. Krasna*]. . . ." (*Id.* at p. 646.) *Jiminez* likewise cites *SFUSD,* apparently approvingly, though without describing its holding. (*Jimenez, supra,* 29 Cal.4th at p. 483.)

For these reasons, I do not believe that *SFUSD* is inconsistent with *Aas.* In my view, *SFUSD* remains good law. Together with the *Transwestern* case, *SFUSD* supports the view that property damage occurs when a toxic substance previously present in a structure is released, resulting in contamination. (*SFUSD, supra,* 37 Cal.App.4th at p. 1329; *Transwestern, supra,* 46 Cal.App.4th at pp. 526, 530.) Such contamination thus constitutes appreciable harm for purposes of accrual of the statute of limitations.

(ii) *Out-of-pocket losses*

As the *Aas* court states, "defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably

fit the definition of ' "appreciable harm" '—an essential element of a negligence claim." (*Aas, supra,* 24 Cal.4th at p. 646.) Inferentially, the converse is also true: an involuntary payment to abate or repair a defect *could* constitute appreciable harm. That point was left open in *Aas,* as appears in the high court's later discussion of *Huang v. Garner* (1984) 157 Cal.App.3d 404 [203 Cal.Rptr. 800] (*Huang*). (See *Aas,* at pp. 648–649.)

In *Huang,* the appellate court reversed a nonsuit for the defendants, thereby permitting the plaintiffs to offer proof on their claims for the cost of repairing defects in an apartment building. (See *Aas, supra,* 24 Cal.4th at p. 648.) "Some of the alleged defects had caused property damage, and some had not." (*Ibid.*) And some defects were the subject of an abatement notice by local officials, which required the plaintiffs to repair specified problems. (*Id.* at p. 649; see *Huang, supra,* 157 Cal.App.3d at p. 424, fn. 13.) The high court criticized *Huang's* analysis as "not entirely satisfactory because [some] alleged construction defects in that case had neither caused property damage nor been cited in the notice of abatement. [Citation.] Even accepting for the sake of argument the *Huang* court's suggestion that a notice of abatement might suffice to convert repair costs into tort damages, the decision offers no adequate explanation for permitting the plaintiffs, consistently with *Seely, supra,* 63 Cal.2d 9, to recover repair costs for the other defects that had neither appeared in the notice nor resulted in property damage. Accordingly, we disapprove *Huang* to the extent it is inconsistent with the views set out in this opinion." (*Aas, supra,* 24 Cal.4th at p. 649.) Although the *Aas* court partially disapproved *Huang,* it left open the possibility that "a notice of abatement might suffice to convert repair costs into tort damages. . . ." (*Ibid.*)

In deciding whether out-of-pocket costs represent economic loss or property damage in a given case, it is important to avoid confusing "the measure of the damages with the nature of the damage." (*Transwestern, supra,* 46 Cal.App.4th at p. 531.) " 'While economic loss is measured by repair costs, replacement costs, loss of profits or diminution of value, the measure of damages does not determine whether the complaint is for physical harm or economic loss. . . . In other words, the fact that the measure of the plaintiff's damages is economic does not transform the nature of its injury into a solely economic loss. . . . Physical harm to property may be measured by the cost of repairing the buildings to make them safe.' " (*Ibid.,* quoting *Northridge Co. v. W.R. Grace and Co.* (1991) 471 N.W.2d 179, 184 [162 Wis.2d 918]; see also, e.g., *Collins Development Co. v. D. J. Plastering, Inc.* (2000) 81 Cal.App.4th 771, 779 [97 Cal.Rptr.2d 83] ["fact that damages for this physical damage were calculated on the basis of the cost of repair[] . . . so that the damage to the other parts of the building would abate did not change the nature of the damage"].)

## 2. *Application*

With those principles in mind, I turn to the case at hand.

Because this part of the case is before us following defense summary judgment, appellate review is de novo. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) That review follows the same analysis undertaken by the trial court: After identifying the issues framed by the pleadings, the court determines whether the moving defendants have established facts justifying judgment in their favor; if so, the court decides whether the plaintiffs have demonstrated the existence of a triable issue of material fact. (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534].)

Within the context of the issues raised by the pleadings, the first question is whether defendants carried their burden of producing evidence showing that plaintiffs' negligence and strict products liability claims are time-barred. In my view, they have not.

The defense theory is that the statute of limitations on these causes of action accrued either upon application of the paint, which occurred decades ago, or upon plaintiffs' discovery of the hazardous nature of the paint that had been applied, which also occurred outside the limitations period. In my view, the defense theory confuses the wrongdoing (providing the toxic material or failing to warn of its hazards) with the injury (appreciable harm). (*SFUSD, supra,* 37 Cal.App.4th at p. 1333.) Here, defendants offered no evidence on the question of when plaintiffs sustained appreciable harm, which was either when plaintiffs incurred involuntary out-of-pocket costs or when their property suffered damage in the form of contamination.

For these reasons, defendants are not entitled to summary judgment. I would remand the matter with instructions to the trial court to vacate the defense summary judgment on the causes of action for strict products liability and negligence, though on different grounds than the majority.

## B. *The Fraud Cause Of Action*

In light of my conclusions concerning appreciable harm, I would find no reason to construe *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979 [22 Cal.Rptr.3d 352, 102 P.3d 268]. I otherwise agree with the majority opinion as to this cause of action, i.e., its discussion beginning with the elements of fraud. (Maj. opn., *ante,* at pp. 328–329.)

## C. *The Unfair Competition Claim*

I agree with the majority's decision to affirm defense summary judgment as to this claim and its basis for doing so.

In sum, except as discussed above, I join with my colleagues.

A petition for a rehearing was denied March 24, 2006, and respondents' petition for review by the Supreme Court was denied June 21, 2006, S142578. Baxter, J., and Corrigan, J., did not participate therein.